**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TERRANCE GRIFFIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 50415** |
| | ) | |
| **AMBER ALLEN, JUSTIN WILKS,** | ) | **Judge Rebecca R. Pallmeyer** |
| **TROY HENDRIX, AND JACOB LONG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Terrance Griffin suffered significant injuries after cutting his arms and swallowing a metal object while incarcerated at Dixon Correctional Center ("Dixon"). In his third amended complaint, filed by recruited counsel, Griffin sues four employees of the Illinois Department of Corrections ("IDOC"): Amber Allen, Justin Wilks, Troy Hendrix, and Jacob Long (collectively "Defendants") (in earlier complaints, Plaintiff named a number of medical providers as Defendants; his claims against those Defendants have been settled). He alleges that the IDOC employees were deliberately indifferent in either ignoring indications of his intent to attempt suicide (Defendant Long) or refusing to adequately provide medical care following the attempt (Defendants Allen, Wilks, and Hendrix.) Both Plaintiff and Defendants now move for summary judgment under Federal Rule of Civil Procedure 56. For the reasons discussed below, Defendants' motion is granted in part and denied in part, and Plaintiff's motion is denied.

<u>**BACKGROUND**</u>

In preparing the factual account that follows, the court has relied on the parties' statements of fact and responses, submitted in accordance with Local Rule 56.1. [1]

---

[1] These materials will be cited as follows: Plaintiff's Local Rule 56.1(a)(2) Statement of Undisputed Materials Facts [245], hereinafter "PSOF"; Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Facts [263], hereinafter "PSOAF"; Defendants' Local Rule 56.1(a)(2) Statement of Undisputed Material Facts [251], hereinafter "DSOF"; Defendant's Local Rule

I.      **Factual Background**

Plaintiff Terrance Griffin was an inmate in IDOC from June 29, 2014, until he was released on December 6, 2023.  (PSOF ¶ 1.)  From approximately April 2017 to August 2018, Plaintiff was housed at Dixon's Psychiatric Unit, known informally as "X House."  (*Id*. ¶ 2.)  X House is a designated housing unit within Dixon reserved for maximum-security, mentally ill prisoners.  (*Id*. ¶ 3, Defs.' Resp. to PSOF ¶ 3.)  Plaintiff was assigned to X House after his health care providers recommended that he be placed in a special treatment unit where he "would benefit from being in a more structured environment . . . more frequent mental health sessions . . . [and] from being closely monitored by a psychiatrist."  (Special/Residential Treatment Unit Referral [247-7] at GR_000763.)  In the same recommendation, Plaintiff's providers noted that he had reported a history of suicidal ideation and had made two prior suicide attempts.  (*Id*. at GR_000764.)

A.      **Plaintiff's Attempted Suicide and Treatment**

On October 4, 2017, Plaintiff began having suicidal thoughts.  (Griffin Dep. Tr. [247-5] at 25:18–22.)  Using a 11-centimeter-long piece of metal broken off from the facility's chain link fence, Plaintiff lacerated both of his arms, making cuts approximately one inch in length.  (*Id*. at 27:5–28:1.)  The cuts severed Plaintiff's "AC" vein.[2]  (*Id*. at 28:6–11.)  Plaintiff then swallowed the piece of metal used to cut his arms.  (*Id*. at 29:23–30:2.)

---

56.1(b)(3) Statement of Additional Material Facts [261], hereinafter "DSOAF".  Responses are cited as Defs.' Resp. to PSOF [260], Defs.' Resp. to PSOAF [271], Pl.'s Resp. to DSOF [264], and Pl.'s Resp. to DSOAF [272].

[2]      It is not clear from the record whether the "AC" vein Plaintiff refers to is the accessory cephalic vein, or one of the several antecubital veins in the forearm.  The accessory cephalic vein is "a variable vein that passes along the radial border of the forearm to join the cephalic vein near the elbow." *Accessory cephalic vein*, STEDMAN'S MEDICAL DICTIONARY 2095 (28th ed. 2006).  "Antecubital," on the other hand, means "anterior to the elbow." *Antecubital*, STEDMAN'S MEDICAL DICTIONARY 100 (28th ed. 2006).  Antecubital vein may refer to the cephalic vein, which is a "subcutaneous vein that arises at the radial border of the dorsal venous network of the hand, passes upward anterior to the elbow and along the lateral side of the arm; it empties into the upper part of the axillary vein." *Cephalic* vein, STEDMAN'S MEDICAL DICTIONARY 2097 (28th ed. 2006).  It may also refer to the median cubital vein "that passes across the anterior

Hours later, a correctional officer (Defendant Long) found Plaintiff bleeding on the floor of his cell. (DSOF ¶ 11; *see also* IDOC Incident Report [251-7] at 1.) He was immediately taken to the medical wing where the attending nurse bandaged and assessed his wounds. (DSOF ¶¶ 13–15.) Dixon medical staff then placed Plaintiff on a ten-minute suicide watch (*see* IDOC Incident Report at 1), but it does not appear that they ordered any further treatment or medication to stabilize him (*see* Pl.'s Medical Administrative Records [247-16] at IDOC 000071). The next day, October 5, the nurse practitioner stationed at Dixon, Nurse Susan Tuell, stitched the wounds in Plaintiff's arms. (PSOF ¶ 37.) Plaintiff informed her then that he had swallowed the metal object used to make the cuts. (*Id*. ¶ 38.) Plaintiff's abdomen was X-rayed on October 6; the print revealed that the piece of metal was lodged in his "subrapubic area." (PSOF ¶ 38.) Dixon medical staff did not order surgery to remove the object, choosing instead to allow the object to exit Plaintiff's body via bowel movement. (*Id*. ¶ 39.) Subsequent x-rays taken on October 6, 10, 13, 16, 20, 26, however, showed that the piece of metal had not moved from Plaintiff's abdomen. (*Id*. ¶ 44; *see* Pl.'s Radiology Records [247-18].) On October 16, a Nurse Tuell at Dixon determined that Plaintiff required an appointment with a gastroenterologist ("GI"). (*See* PSOF ¶ 45; *see also* IDOC Referral [247-19] at 1.) For unclear reasons,[3] this appointment never took place. (*See* PSOF ¶ 47.)

Throughout the month of October 2017, Plaintiff asserts, he was experiencing "severe pain in [his] abdominal area." (Griffin Decl. [247-2] at ¶ 4.) The first record of Plaintiff's complaints

---

aspect of the elbow from the cephalic vein to the basilic vein . . . . [O]ften used for venipuncture." *Median cubital vein*, STEDMAN'S MEDICAL DICTIONARY 2101 (28th ed. 2006).

[3]     As noted, the nurse practitioner treating Plaintiff determined that he needed to see a specialist on October 16, and Defendant Allen's review of Plaintiff's treatment also observed that a referral to a local GI had been ordered. (*See* Grievance Response [251-10] at IDOC Sub. 001463.) Plaintiff's expert Dr. Peter Kahrilas, a licensed gastroenterologist and Gilbert H. Marquardt Professor of Medicine at Northwestern University's Feinberg School of Medicine, notes in his report that Plaintiff had been prepped for the appointment (though he was unable to ingest the prep liquid because he found it "unpalatable") but "[t]hat visit to the local GI never ended up happening." (Dr. Kahrilas Report [247-15] at 5–6.)

about this pain was on October 17, 2017, when Plaintiff submitted a formal medical grievance stating that he was experiencing "severe pain" and informing administrators that the metal object he had swallowed was "tearing open [his] insides." (PSOF ¶ 48.) Defendant Allen, reviewing Plaintiff's grievance on October 24, 2017, found "no evidence of anything that will substantiate his claims [of pain] by medical," and denied the grievance. (*See* Grievance Response at IDOC Sub. 001463.) Later that day, an IDOC Grievance Officer, James Martens, reviewed and agreed with Allen's determination. (*See* Grievance Officer Report [247-22].) On November 1, the Chief Administrative Officer at Dixon concurred with Marten's decision to take no further action with respect to Plaintiff's grievance. (*Id.*)

In addition to his formal grievance, on October 17, 18, 28, and November 1, Plaintiff submitted sick call requests to Dixon's medical unit demanding surgery to remove the object and noting "stabbing pain" in his abdomen. (*See* PSOF ¶¶ 51–54.) It does not appear that any of these requests were answered. Between October 6, 2017, and November 3, 2017, Plaintiff was not provided with any pain medication, was not recommended for surgery to remove the foreign object, and was not examined by a gastroenterologist or surgeon. (*Id.* ¶¶ 43, 47.) On two occasions, October 18 and 26, 2017, medical staff at Dixon prescribed a laxative to help pass the metal object, but Plaintiff refused or was unable (the parties disagree on this point) to ingest it. (Pl.'s Medical Administrative Records, IDOC 000071–72; *see* DSOAF ¶ 4, Pl.'s Resp. to DSOAF ¶ 4.) By November 3, the pain had become "sharp" and "extreme." (PSOF ¶ 68.) A CT scan performed that day revealed that the metal object had perforated Plaintiff's bowel. (*See* Dr. Kahrilas Report at 6.) Three days later, on November 6, a second CT scan confirmed that finding; the object had perforated Plaintiff's bowel, and Plaintiff was immediately taken to the UIC hospital for an emergency medical procedure to remove the metal object. (*Id.*) He remained hospitalized at UIC for approximately a month, requiring subsequent operations to manage complications (bowel blockages and infections) resulting from the emergency surgery. (PSOF ¶ 70.) After being discharged from UIC, Plaintiff spent another 21 days in the Dixon infirmary due to continuing

4

abdominal pain. (*Id*. ¶ 71.)  Plaintiff's expert, Dr. Kahrilas, has opined that the delay in obtaining surgery caused the bowel perforation, contamination of his abdomen with peritonitis, and more complicated surgical management.  (Dr. Kahrilas Report at 7.)  Plaintiff has claimed that each defendant played a different role in either allowing his suicide attempt to occur or allowing the delay in surgery required after that attempt.

### B.    Claim Against Long

Jacob Long was a correctional officer employed by Dixon from 2014 until 2019.  (PSOF ¶ 22.)  During the period in 2017 when Plaintiff was housed at X House, Long worked the 3:00 pm–11:00 pm shift.  (*Id*.)  Long's responsibilities included performing a "count"—that is, verifying the presence of every inmate assigned to the particular cell house, at the beginning and near the end of Long's shift.  (*See* Long Dep. Tr. [247-11] at 17:18–18:10.)  Long also performed hall-checks every thirty minutes between 9:30 and 11:00 pm.  (PSOF ¶ 24.)  In his deposition, Long testified that he was aware that individuals housed in X House were there due to "some type of mental issue," but he did not have access to specific information about particular inmates.  (Long Dep. Tr. at 42:8–22, 44:16–23.)  Though he does not recall receiving training on how to deal with mental health emergencies prior to 2017, Long has no "reason to doubt" that he did receive cyclical training on the signs and symptoms of mental illness as part of his first aid training prior to 2017.  (*Id*. at 109:5–110:22.)  Long testified that when an inmate requested the assistance of a "crisis team" (a group of correctional officers specifically trained for dealing with inmates going through mental distress), Long would "always" comply with such a request.  (*Id.* at 28:7-15; 51:21–24.)

On October 4, 2017, at 3:15 p.m., while Long was performing the inmate "count," Plaintiff alleges that he informed Long that he was having "bad thoughts" and needed a crisis team. (Griffin Dep. Tr. 25:18–26:11.)  According to Plaintiff, after hearing this request, Long looked at Plaintiff, but kept walking and did not call a crisis team or seek other immediate assistance. (PSOF ¶ 31.)  Several hours after this alleged interaction, at approximately 10:40 pm, Long

discovered Plaintiff bleeding in his cell and immediately called a "Code 3," signifying a medical emergency. (PSOF ¶ 36.) Long does not recall Plaintiff's request for a crisis team, nor anything else about Plaintiff or the October 2017 incident. (Long Dep. Tr. at 53:10–21.) Plaintiff claims that in ignoring his request for a crisis team, Long was deliberately indifferent to the serious risk that Plaintiff would attempt to harm himself. (*See* Pl.'s Mem. [246] at 12.)

### C.    Claim Against Allen

Amber Allen was the Health Care Unit Administrator at Dixon between 2015 and 2021. (PSOF ¶ 7.) This role required Allen to "manage[] and direct[] the daily operations of the health care unit on a 24–hour basis." (Allen Dep. Tr. [247-8] at 26:5–11.) Allen's responsibilities included "organiz[ing] and coordinat[ing] patient care assignments" (*id*. at 26:12–28:1), "monitor[ing] health care services provided to inmates at off-site health care facilities" (*id*. at 31:19–32:7), and generally "ensur[ing] that the . . . [Dixon] health care staff complied with [IDOC] policies and procedures" (*id*. at 30:4–18). Allen testified in her deposition that her role is "to provide [incarcerated individuals] what they need," including providing outside medical care for an inmate if that is "what he needs." (*See id*. at 246:6–16.) Allen herself does not provide medical treatment to individuals in custody, however (DSOF ¶ 40), and her supervisory role does not give her the authority to overrule or "overstep" the decisions of Dixon health care providers. (*Id*. at 246:16–21.) The parties dispute the extent of Allen's authority to intervene in medical care that she deemed insufficient. (*See* Pl.'s Resp. to DSOF ¶ 38.)

Plaintiff has alleged that at some point between October 4 and November 3, 2017 (he cannot remember the date), he sent a letter to Allen, making her aware of his ongoing pain and need for surgery. (*See* Griffin Dep. Tr. at 109:1–16.) The letter is not in the record. Plaintiff alleges that Allen never responded to his letter, nor took any steps to provide him with the treatment he needed. Apart from this letter, Plaintiff never interacted with Allen and never spoke with her face-to-face. (*Id*.) On October 24, Allen reviewed the formal grievance that Plaintiff had filed, stating that he had not received adequate medical care for his injury. (DSOAF ¶ 16.) Allen

6

responded to the grievance by stating that Plaintiff was "given treatment and followed up appropriately by medical staff," noting that there were "[n]o complaints [of pain] lately." (*See* Grievance Response at IDOC Sub. 001463.) Allen testified that she reached this conclusion from a review of Plaintiff's medical records and the incident report from the October 4, 2017, suicide attempt. (*See* Pl.'s Resp. to DSOAF ¶ 16 (citing Allen Dep. Tr. at 148:7–149:11).) On October 30, 2017, Jeremy Ellis, the Nursing Supervisor at Dixon, included Allen in an email chain presenting Plaintiff's complaints about the metal object he had swallowed weeks earlier, but it does not appear that she responded. (*See* Email Chain [247-25] at IDOC Sub. 001446–47.) In that same email chain, Ellis also reported that Plaintiff's providers had ordered medication to help him "pass any potential foreign bodies," but Plaintiff had refused to take the medication. (*Id*.)

For her part, Allen does not recall receiving any letter from Plaintiff. (DSOF ¶ 43.) She testified in her deposition that she receives many letters from inmates regarding their medical care, despite her explicit instructions to inmates that the proper method for them to object to medical care is by submitting a sick call request or filing a grievance. (*See id.* ¶ 42, Allen Dep. Tr. at 53:8–54:6.) (As noted, Plaintiff did in fact file a grievance on October 17, and sick call requests on October 17, 18, 28, and November 1.) Allen does not read every letter sent to her; she instead delegates that task to her staff, who may "bring it to [her] attention" if "something looked really bad." (*Id*. at 60:21–61:2.) There were "rare occasions" where Allen saw a letter that "warranted a response from [her] that [she] would manage it immediately and deal with it." (*Id*. at 60:10–20.) Plaintiff claims that Allen was deliberately indifferent in ignoring his letter and refusing to "inquire further of Mr. Griffin's health care providers." (Pl.'s Mem. at 14.)

### D. Claim Against Wilks

From 2017 to 2022, Justin Wilks was the Assistant Warden of Operations at Dixon. (PSOF ¶ 17.) In this role, Wilks oversaw "safety and security" at Dixon, supervising all correctional officers. (*Id*. ¶ 18.) Wilks interacted with inmates during his daily tours of the facilities, answering "any concerns" an inmate may have, including medical concerns. (*Id*. ¶¶ 19, 20.) Inmates could

raise medical concerns with Wilks directly, and Wilks testified that when an inmate complained about the need for medical care, Wilks would address it with the nurse assigned to the unit and follow up the following day by letting the inmate know that Wilks had contacted the nurse. (*See* Wilks Dep. Tr. [247-6] at 27:4–28:7.)

At some point in October 2017—again, Plaintiff cannot provide a specific date—Plaintiff had a conversation with Wilks (presumably during one of Wilks' tours) in which he told Wilks about the metal object in his body and that he needed emergency medical treatment. (PSOF ¶ 59.) Plaintiff alleges that Wilks responded only by saying, "[w]ell, whose fault is that? I guess you're going to have to shit it out," and took no further action. (*Id.*) Wilks does not recall this interaction, nor does he recall taking any steps on Plaintiff's behalf. (*Id.* ¶ 60.) Plaintiff claims that in failing to follow up on his behalf, Wilks was deliberately indifferent to his need for emergency surgery. (Pl.'s Mem. at 14.)

### E.     Claim Against Hendrix

Defendant Troy Hendrix was the Superintendent of Dixon from 2017 until his retirement in 2019. (PSOF ¶ 12.) Like Wilks, Hendrix conducted tours of the Dixon facilities, including X House and, like Wilks, heard from inmates about their concerns, including those relating to medical treatments. (*Id.* ¶¶ 14, 15.) If Hendrix received such complaints, he "simply made a phone call and made sure [the inmate] was being seen and moved on from there, ma[king] sure that he was receiving medical care appropriately." (Hendrix Dep. Tr. [247-10] at 103:18–104:5.)

Plaintiff recalls two occasions on which he informed Hendrix about his ongoing pain from the piece of metal fencing inside his body. First, approximately a week after ingesting the object, Plaintiff claims that he informed Hendrix that the object was lodged in his stomach and that he was in pain. (*See* Griffin Dep. Tr. at 105:13–22.) Hendrix promised to "look into it" but never followed up with Plaintiff. (*Id.*) Plaintiff also recalls that, about a week after that first interaction, he encountered Hendrix again and informed him that the object was still in his stomach and that he needed surgery. (*Id.* at 106:1–24.) Once again, Hendrix promised to look into the matter, but

8

did not follow up. (*Id.*) Hendrix does not recall either of these interactions. (PSOF ¶ 60.) Hendrix does recall, however, reviewing Plaintiff's official grievance on October 23, 2017, and determining that Plaintiff's situation constituted an "emergency." (Hendrix Dep. Tr. at 86:8–23.) This placed Plaintiff's grievance on an expedited schedule. (*See id.* at 86:24–87:9.) Nonetheless, Plaintiff claims that Hendrix was deliberately indifferent in failing to follow up on the complaints made to him directly, informing him of Plaintiff's ongoing medical need. (Pl.'s Mem. at 14.)

## II.    Procedural History

Plaintiff initially brought this action under the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and 42 U.S.C. § 1983 against the current Defendants as well as four additional defendants (three doctors and one nurse practitioner) employed by Wexford Health Services ("Wexford Defendants"). (*See* Compl. [1] at 7–8.) Plaintiff reportedly settled with the Wexford Defendants (*see* Pl.'s Mot. for Time to Execute Settlement Agreement [227]) and filed the most recent Third Amended Complaint [239] ("TAC") against only the IDOC Defendants. Plaintiff's claims in the TAC are limited to allegations of deliberate indifference under 42 U.S.C. § 1983. (*See* TAC at 20–22.) Discovery is complete and both sides have moved for summary judgment. In his motion [243], Plaintiff argues that Defendants' lack of memory regarding Plaintiff's factual claims requires the court to conclude that there are no material disputes and that Plaintiff is therefore entitled to judgment as a matter of law. (*See* Pl.'s Mem. at 1.) For their part, Defendants contend [248] that Plaintiff cannot, as a matter of law, establish that Long was aware of Plaintiff's intent to commit suicide, or that the administrative officers at the IDOC are liable under the Eighth Amendment for defects in Plaintiff's medical treatment. (*See* Defs.' Mem. [250] at 2–3.)

## <u>LEGAL STANDARD</u>

"Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)). A genuine issue of material

fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "On cross-motions for summary judgment, all facts and inferences are drawn in the light most favorable to the nonmoving party on each motion." *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quotations marks and citations omitted).

This case involves deliberate indifference claims under the Eighth Amendment, actionable against state prisons and their staff via the Fourteenth Amendment and 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). "To forge a successful claim of deliberate indifference, [Plaintiff] must demonstrate that the defendants had subjective knowledge of the risk to the inmate's health and disregarded that risk." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This involves both an objective and subjective element. "The objective component is that the prisoner must have been exposed to a harm that was objectively serious." *Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020), *as amended* (July 2, 2020) (citing *Farmer*, 511 U.S. at 834). "The subjective component requires the plaintiff to demonstrate that the prison official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and he must have 'draw[n] th[at] inference.'" *Stewart*, 14 F.4th at 763 (citing *Balsewicz*, 963 F.3d at 654–55). In other words, "[the court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

## DISCUSSION

As noted, both sides seek summary judgment in this case. A party seeking summary judgment has the initial burden of "inform[ing] the district court why a trial is not necessary." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citation omitted). Defendant can discharge that burden by demonstrating the absence of evidence to support the plaintiff's case.

*Id.* Once defendant makes such a showing, the plaintiff must demonstrate that there is evidence from which a factfinder could find in plaintiff's favor. *Id.* at 1169. Plaintiff need not "persuade the court that his case is convincing; he need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact" by presenting "definite, competent evidence to rebut the motion." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019).

## I.  Defendant Long

The evidence relating to Plaintiff's claim against Long is largely undisputed. Long was on duty at X House on October 4, 2017, and, at some point during Long's shift that evening, Plaintiff used a metal object to cut his arms. (*See* Defs.' Mem. at 3.) Defendants have not denied, beyond failing to recall, that at some point prior to this incident, Plaintiff represented to Long that he was having "bad thoughts" and "needed a crisis team." (DSOF ¶ 10.) Furthermore, Defendants do not dispute the established rule in this circuit that "the risk of suicide is an objectively serious medical condition." (Pl.'s Resp. [259] at 8 (quoting *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019).) Rather, Defendants contend that Plaintiff's statement that he was having "bad thoughts" did not give rise to subjective awareness on Long's part that Plaintiff was at risk of imminently committing suicide. (*See* Defs.' Mem. at 4–5.) Plaintiff counters that, given Long's knowledge that inmates at X House are mentally ill, Plaintiff's report of having "bad thoughts" and needing a crisis team established a subjective awareness that Plaintiff was suicidal. (Pl.'s Resp. at 8–9.)

In assessing these arguments, two recent (though unpublished) decisions are instructive. In *Johnson v. Garant*, 786 F. App'x 609 (7th Cir. 2019), an inmate at Stateville Correctional Center in Illinois alleged that three correctional officers were deliberately indifferent to the risk of suicide when, returning from a medical appointment, plaintiff told correctional officers that he was "hearing voices," "wanted to commit suicide," and "felt unsafe in his cell." 786 F. App'x at 609. The officers ignored these statements and returned plaintiff to his cell in segregated housing. *Id.* The plaintiff proceeded to attempt suicide "by burning his arm with a roll of toilet paper that he set on fire." *Id.* In his subsequent action against the officers for deliberate indifference resulting in the burn

injuries, the district court granted summary judgment in favor of the officers, and the Seventh Circuit affirmed. The Court of Appeals concluded that "a reasonable jury could not find that the defendants knew of a substantial risk of suicide based only on Johnson's statements that he felt suicidal and wanted to speak to a crisis counselor." *Id*. at 610. To meet the subjective prong of the deliberate indifference analysis for harm related to attempted suicide, the court observed, plaintiff must show that the defendant was "cognizant of the significant likelihood that an inmate may *imminently* seek to take his own life." *Id*. (quoting *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (emphasis added). The court concluded that Johnson's statements alone, without other indications of suicidal intent, "lacked any indication that [plaintiff] may have 'imminently' sought to have harmed himself." *Id*.

Similarly, in *Wright v. Funk*, 853 F. Appx. 22 (7th Cir. 2021), "a depressed Wright was in his cell and experiencing suicidal thoughts" and called out to a passing correctional officer that "I'm having suicidal thoughts of taking myself out." 853 F. App'x at 23. Thirty minutes later, Wright used the intercom in his cell to inform a different correctional officer that "he was having suicidal thoughts and wanted to speak with the prison's psychological services unit." *Id*. The officer told Wright that he would have to wait until the next day. *Id*. Four hours later, Wright informed the officers that he had ingested 50 pills of acetaminophen and ibuprofen in an attempted suicide. *Id*. Following the attempt, the plaintiff alleged that he "experienced stomach pain, a migraine, drowsiness, and weakness" and "vomited, had diarrhea, and lost consciousness" when taken to the prison hospital. *Id*. He sued the officers for deliberate indifference. *Id*. Again, the court affirmed summary judgment in favor of the officer defendants, finding that "no reasonable jury could find that [defendants] knew of a substantial risk of suicide based on Wright's statements that he was having suicidal thoughts and would like to speak with someone from the psychological services unit." *Id*. at 24. Although records showed Wright's history of mental illness and a prior attempted suicide, he presented no evidence that the correctional officers were aware of these

records.  *Id*.  His statements to the defendants alone "did not put the officials on notice that Wright would imminently attempt to harm himself."  *Id*.

      *Johnson* and *Wright* are thus distinguishable, as the Seventh Circuit observed, from *Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001), on which Plaintiff Griffin relies. (*See* Pl.'s Mem. at 11, Pl.'s Reply [269] at 3.); *see Wright*, 853 F. App'x at 23; *Johnson,* 786 F. App'x at 610–11.  In *Sanville*, prison guard defendants were fairly charged with knowledge of the plaintiff's imminent intent to attempt suicide where, in addition to being aware of the plaintiff's suicidal thoughts from plaintiff's verbal warnings, "the defendants also knew that: [plaintiff] had written a last will and testament; he had previously attempted suicide; he was no longer eating; and his mother had called the prison to alert them that her son was suicidal."  *See Johnson*, 786 F. App'x at 611 (describing holding in *Sanville*, 266 F.3d at 737)).  As the court noted in *Johnson*, "[t]hese additional facts would be enough to put a defendant on notice that the plaintiff's statement was not idle."  *Id*.  Without such additional circumstances, Plaintiff Griffin's bare statement of suicidal intent (even paired with a request for a crisis team), as in *Johnson* and *Wright,* does not establish subjective awareness of an imminent risk of suicide.  *See Willnow v. Tierney*, No. 22-CV-128-JDP, 2023 WL 5672696, at *4 (W.D. Wis. Sept. 1, 2023) ("[S]tatements that [plaintiff] was having 'bad thoughts' of self-harm . . . alone are not enough to sustain an Eighth Amendment claim under cases like *Wright* and *Johnson*.")

      The facts here closely mirror the facts of *Wright* and *Johnson.*  As in those cases, Plaintiff's claim against Long is based on his report that he was having bad thoughts and needed a crisis team—essentially identical to the statement made in *Johnson*.  While Plaintiff has introduced evidence of a history of suicidal ideation and attempts (*see* PSOF ¶ 5–6), he does not dispute that Long has no awareness of this history.  (*See* Pl.'s Resp. to DSOF ¶ 28.)  Long understood that X House was reserved for patients with mental illness (PSOF ¶ 26), but he had no knowledge or training concerning specific mental illnesses or about particular inmates.  (*See* Long Dep. Tr.

42:8–22, 44:16–23.) Nor is there any evidence that Long was aware that Plaintiff had possession of the strip of chain link fence, or that Plaintiff's intent to commit suicide was "imminent."

Plaintiff also relies heavily on *Estate of Miller ex rel. Bertram v. Tobiasz,* 680 F.3d 984, 987 (7th Cir. 2012). (*See* Pl.'s Resp. at 9.) In that case, Miller's estate brought deliberate indifference claims against various prison officials, including correctional officers, after Miller committed suicide while incarcerated. Reviewing a denial of qualified immunity, the Seventh Circuit found that the correctional officer defendants had subjective awareness of the decedent's risk of harm: they "knew or should have known of [decedent]'s mental illness and suicide attempts because he was adjudicated mentally ill, had court-ordered medications which he refused to take at 8:30 p.m. the night he died, and he had a well-documented history of suicidal behavior" and was housed "where inmates in need of greater supervision are placed." *Id.* at 990. But *Tobiasz* is procedurally distinct from this case. *Tobiasz* involved an interlocutory appeal from denial of qualified immunity—the court had to determine whether the plaintiff estate had a "plausible" claim against the defendant security officers prior to discovery. *See id.* at 989–90 ("While discovery may prove otherwise, [the security officers'] knowledge of the risk can reasonably be inferred at this very early stage of the litigation.)[4] In this case, discovery has revealed that Long did not have actual awareness of Plaintiff's history of suicide or reason to know of this history. Defendant Long is entitled to summary judgment.

## II. Administrative Defendants

Defendants argue that Plaintiff's claims against Allen, Wilks, and Hendrix all fail as a matter of law because, as non-medical administrative officials, they "lack[ed] personal involvement in the constitutional violations alleged by Plaintiff." (Defs.' Mem. at 3.) They cast

---

[4] On remand, the case was settled prior to summary judgment. *See* Order Approving Minor Settlement, *Estate of Miller v. Michlowski,* No. 3:10-cv-00807-wmc (W.D. Wis. March 4, 2013).

Plaintiff's claims against Allen, Wilks, and Hendrix as a disguised complaint that "he did not get the medical treatment he wanted." (*Id*. at 12.)

As both parties recognize, non-medical administrators may be liable in limited circumstances for deliberate indifference to substandard medical care. (*See* Defs.' Mem. at 9, Pl.'s Resp. at 10.) Generally, "non-medical defendants . . . can rely on the expertise of medical personnel . . . . [I]f a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). But "nonmedical officials can be chargeable with . . . deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir.2008) (quotations omitted). A plaintiff must show that "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Arnett*, 658 F.3d at 755 (quotations omitted). "Once an official is alerted of such a risk, the 'refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.'" *Id*. (quoting *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir.1996). The operative test at summary judgment, therefore, is whether Plaintiff has introduced "definite, competent evidence" that would allow a reasonable jury to conclude that (1) there was an excessive risk to Plaintiff's health or safety, *see Arnett*, 658 F.3d at 755; (2) that the medical care he was receiving constituted "mistreating (or not treating)," *see Hayes*, 546 F.3d at 525; and (3) that each administrative Defendant was made aware of the risk and mistreatment but deliberately disregarded them, *see Vance*, 97 F.3d at 993.

### A. Excessive Risk to Health and Safety

Unlike his claim against Long, Plaintiff's claims against the administrative Defendants are not based on his attempted suicide. Rather, his claims arise out of the "intense, sharp abdominal pain" that he was experiencing from the presence of the metal object in his body. (*See* Pl.'s Mem. at 5.) Severe and ongoing pain qualifies as a serious or excessive risk to health for the purposes

of deliberate indifference claims.  *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011).

Indeed, "deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eight

Amendment claim," even without a claim that a delay in treatment caused a separate, excessive

risk to health.  *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012); *see also Arnett,*

658 F.3d at 751 ("A delay in treating non-life-threatening but painful conditions may constitute

deliberate indifference if the delay exacerbated the injury *or* unnecessarily prolonged an inmate's

pain.") (emphasis added).  Furthermore, "[a] medical condition is objectively serious," for the

purposes of a deliberate indifference claim, if "the need for treatment would be obvious to a

layperson."  *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Defendants argue that the record contradicts Plaintiff's allegation of serious pain.  They

cite the undisputed fact that Plaintiff got into a physical altercation during a basketball game on

October 20, 2017, and contend that this undermines any allegation that he was experiencing paint

that would give rise to deliberate indifference.  (*See* DSOAF ¶ 8–9.)  Defendants further point out

that progress reports during medical appointments in the period between October 4 and

November 3, 2017 either make no mention of abdominal pain or affirmatively report that Plaintiff

was feeling "0 acute distress" and was "not uncomfortable."  (*See id.* ¶¶ 5, 10.)  Plaintiff responds

by arguing[5] that getting into a physical altercation is not necessarily inconsistent with recurring

instances of pain, and pointing out that Defendants have not disputed Plaintiff had made various

complaints of pain through a formal grievance and various sick call requests, *see supra* p. 3–4,

before and after the altercation.  (*See* Pl.'s Reply at 8–9.)

The parties' argument on this point demonstrate that the extent of Plaintiff's pain is a

matter of disputed fact, and the court will not weigh the credibility of competing evidence at this

---

[5]      Defendants only raise this argument, for the purpose of their motion for summary
judgment, in their reply brief.  (*See* Defs.' Reply at 9–10.)  The issue was briefed more
comprehensively in connection with Plaintiff's motion for summary judgment (*see* Defs.' Resp.
[262] at 12–13) and Plaintiff had the opportunity to address the argument at length in his reply
brief (*see* Pl.'s Reply at 8–9), so the court will consider those filings here.

stage. See *Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008). For the purposes of Defendants' motion for summary judgment, the court must infer in favor of Plaintiff that he was in fact experiencing prolonged and severe pain. Moreover, it is undisputed that Plaintiff had an 11-centimeter-long metal object in his body for weeks following his suicide attempt; the need for medical attention for such a condition would be obvious to any layperson.

### B.    Mistreatment or Non-Treatment

Because non-medical administrators may generally "rely on the expertise of medical personnel," Plaintiff may pursue his claims against Allen, Wilks, and Hendrix only if a reasonable jury could conclude that his treatment constituted mistreatment or non-treatment. *See Arnett*, 658 F.3d at 755. It is undisputed in this case that from the day that Plaintiff swallowed the metal object, he received regular medical treatment and appointments, including routine x-ray imaging. (*See* PSOF ¶¶ 38–44, DSOF ¶¶ 79–86.) Defendants assert that Plaintiff received "adequate and comprehensive health care that resulted in prompt, frequent, and appropriate treatment," and "Plaintiff has no evidence showing that no minimally competent professional would have done anything other than what the Wexford [providers] did." (Defs.' Mem. at 16.)

The court sees this differently, for three reasons. First, Wexford's own General Surgery Guidelines explicitly require that inmates who ingest "high risk objects (large, sharp)" should receive "urgent surgical referral." (*See* PSOF ¶ 40.) Second, Plaintiff has offered expert testimony, in the form of Dr. Kahrilas' report, that his treatment following the discovery of the object in his stomach was "blatantly inappropriate and sub-minimally competent" because "[s]harp objects in the stomach that are >6cm in length represent an urgent situation that should ideally be addressed within 24 hours." (PSOF ¶ 72, Dr. Kahrilas Report at 6.) Third, Plaintiff has shown that on October 16, the nurse practitioner at Dixon noted that Plaintiff required an appointment with a specialist because the object had stalled in his intestines, but he was not treated by a specialist until the object perforated his bowel some two weeks later. (*See* PSOF ¶¶ 45, 69.) This

evidence is sufficient to support a finding that Plaintiff was denied appropriate medical treatment for a serious condition.

### C.    Defendant Allen

To pursue a claim against Allen, Plaintiff must do more than show that the medical care he received was objectively equivalent to mistreatment or non-treatment; he must, in addition, show that Defendant Allen had "reason to believe (or actual knowledge)" of this defective treatment. *See Hayes*, 546 F.3d at 525. The record here shows that Allen could have been apprised of Plaintiff's medical care in several ways: from Plaintiff's letter sent at some point in October 2017 (*see* PSOF ¶ 55), from reviewing his formal grievance on October 24 (DSOAF ¶ 16), from review of his medical records, including multiple x-rays (Allen Dep. Tr. at 148:7–149:11), or from the email chain escalating his complaints on October 30 (*See* Email Chain at IDOC Sub. 001446.) The question here is whether this information gave Allen "sufficient notice to alert . . . her to an excessive risk" of harm to Plaintiff. *Arnett*, 658 F.3d at 755 (quotations omitted). The court finds that a reasonable jury could go either way on this question and denies summary judgment for both parties with respect to Allen.

As Defendants note, Allen viewed medical evidence from Plaintiff's appointments at Dixon that was, as Plaintiff puts it, "factually inconsistent with his grievance." (Pl.'s Resp. at 14.) Plaintiff does not dispute that Allen learned that he was being regularly monitored, had been referred to an outside GI specialist, and had not made any complaints regarding severe pain in his medical appointments. (*See* Pl.'s Resp. to DSOF ¶ 44.) Plaintiff did not in fact see a specialist as ordered by the nurse practitioner on October 16 (*see* Pl.'s Resp. at 17–18), but there is no evidence that Allen knew this; the records she reviewed showed that an appointment had been ordered. (*See* Grievance Response at IDOC Sub. 001463.) And while the October 30 email chain informed Allen that Plaintiff was still in pain and filing requests for sick calls (*see* Pl.'s Resp. at 17), the same email chain also shows that other medical administrators—including the Nursing Supervisor and the Acting Site Mental Health Services Director—had confirmed that Plaintiff was receiving

medication and being further evaluated by medical professionals. (*See* Email Chain at IDOC Sub. 001446.) A reasonable jury could find that Allen was not subjectively aware of an excessive risk of non-treatment, and had satisfied her duty by conducting a prompt investigation in response to Plaintiff's formal grievance "to ensure [herself] that [Plaintiff's] complaints did not require further action." *Hayes*, 546 F.3d at 526–27 (7th Cir. 2008) (affirming summary judgment in favor of non-medical prison officials who reviewed and responded to plaintiff's grievances and "may have been negligent in failing to investigate further after receiving the summaries from the medical staff," but were not deliberately indifferent); *see also Greeno v. Daley,* 414 F.3d 645, 655 (7th Cir. 2005) (affirming summary judgment in favor of grievance officer who had "reviewed [plaintiff]'s complaints and verified with the medical officials that [plaintiff] was receiving treatment").

But the record does not require this conclusion. Taking the facts in the light most favorable to Plaintiff, Allen's review of Plaintiff's medical records showed h was receiving ongoing care, but those same medical records revealed that there was a substantial metal object stalled in Plaintiff's abdomen. (*See* Pl.'s Radiology Records at 2–6.) As she had reviewed the IDOC incident report as part of this review, Allen also knew that this object was sharp enough to have cut Plaintiff's arm and require stitches. (*See* IDOC Incident Report at 1.) In light of the records, Dr. Kahrilas's testimony, and Wexford Surgery Guidelines calling for immediate surgery in these circumstances,[6] a jury could conclude that Plaintiff's treatment by the IDOC providers was so obviously defective that Allen had "reason to believe (or actual knowledge)" of this defective treatment. *See Hayes*, 546 F.3d at 525.

Should the jury reasonably find that Allen was aware that Plaintiff's treatment was defective, it would also have reason to conclude that Allen's conduct was deliberately indifferent

---

[6]     Allen testified that, as health unit administrator, her responsibilities include compliance with "guidelines that came down from Office of Health Services or Wexford Health Services" (Allen Dep. Tr. at 29:4–5) that were "all medical related" (*id*. at 29:19–20). She does not specify the Wexford Surgery Guidelines as among those she was responsible to monitor, but the language of those guidelines would bolster a conclusion that she could have known that Plaintiff's treatment was defective.

in response.  For one, the record shows that in responding to Plaintiff's grievance, Allen did not reach out to any of the Dixon health care staff responsible for his treatment.  (*Cf.* DSOF ¶ 44.) And upon learning that Plaintiff was still complaining of pain from the October 30 email chain, it is undisputed that Allen took no action at all in response.  Most importantly, Allen appears to have taken no steps to ensure that Plaintiff obtained the referral to the outside GI specialist, nor did she follow up to confirm that the visit had occurred.  Under Allen's own description, her job is to ensure that a patient at Dixon gets the medical care he needs, "[a]nd if what he needs is to go out [to an outside specialist] then that's [her] job."  (Allen Dep. Tr. at 246:15–17.)  This responsibility potentially places Allen in a different position than the grievance officers discussed in *Greeno* and *Hayes*—she assumed a duty in responding to medical complaints beyond the grievance investigation.  By failing to take steps to ensure that Plaintiff did in fact see an outside specialist in late October, the jury could conclude that Allen did have a "duty to do more than [she] did."  *Cf. Hayes*, 546 F.3d at 527.

The record concerning Allen's involvement is equivocal.  Allen faced conflicting information in her review of Plaintiff's medical file, particularly with respect to his complaints that he was facing ongoing, severe pain.  (*See* Grievance Response at IDOC Sub. 001463.)  But unlike the other administrative defendants, Allen viewed Plaintiff's medical records, had personal knowledge of the x-rays showing the object lodged in his body, and accepted a level of responsibility in getting inmates the medical attention they need.  Summary judgment in favor of Allen is denied.  Because the claims against her will depend on a careful weighing of (disputed) facts regarding the scope of her authority, the credibility of the evidence before her, and the reasonableness of her reliance on Dixon health care providers, however, the court denies Plaintiff's motion for summary judgment as well.

### D.    Defendant Wilks

Plaintiff's remaining claims have less traction. His claim against Defendant Wilks is based on a single interaction in which Plaintiff communicated to Wilks that there was a metal object stuck

in his body and he needed emergency medical treatment. (PSOF ¶¶ 59–60.) According to Plaintiff's undisputed factual allegations, Wilks responded by saying, "well, whose fault is that? I guess you're going to have to shit it out," and took no further action. (*Id.*) If this callous remark is the extent of Wilks' response to Plaintiff's request for emergency medical care, a reasonable jury could find that Wilks "turned a blind eye to a serious medical condition" and was deliberately indifferent. *See Degrado v. Carter*, No. 13-CV-05978, 2021 WL 3737712 (N.D. Ill. Aug. 24, 2021) (denying summary judgment for non-medical official in deliberate indifference claim where defendant "ha[d] not identified anything demonstrating that he followed up on [plaintiff]'s complaints"); *see also Smego v. Mitchell*, 723 F.3d 752, 757 (7th Cir. 2013) (reversing summary judgment in favor of non-medical official for deliberate indifference claim where official was "in a position at least to bring [plaintiff]'s pain and difficulty obtaining treatment to [doctor]s attention, but she did not" and "[w]hat she did instead was tell [plaintiff] not to be a 'pest'").

Plaintiff's claim against Wilks fails for another reason: causation. For a deliberate indifference claim to survive summary judgment, there must be sufficient evidence in the record for a reasonable jury to conclude that the defendant's deliberate indifference caused the plaintiff's injuries. *See Hoffman v. Knoebel*, 894 F.3d 836, 841 (7th Cir. 2018) ("[T]he official's act must . . . be the cause-in-fact of the injury . . . ."). Wilks may not have adequately responded to Plaintiff's request for surgery, but the record is clear that Wilks' supervisory authority was circumscribed to "security, movement of inmates, maintenance, food service industries, internal investigations, personal property and safety and sanitation"—not medical care. (DSOF ¶ 47.) While Wilks has testified that he occasionally fields complaints from inmates requiring medical attention during his rounds, the only evidence in the record suggests that his course of action is limited to alerting the relevant care providers in the unit. (*See* Wilks Dep. Tr. at 27:9–28:7.) Yet here it is undisputed that the medical providers were well aware of Plaintiff's complaints of pain through repeated sick call requests and formal grievance filings. (PSOAF ¶¶ 21, 25.) Wilks'

failure to notify medical staff thus did not cause Plaintiff's injuries; it was the medical staff's knowledge of his condition and failure to provide adequate care that harmed him.

It is true that, generally, "the causal link between a defendant's deliberate indifference and a plaintiff's injury is typically a question reserved for the jury." *Stockton v. Milwaukee Cnty*., 44 F.4th 605, 615 (7th Cir. 2022) (citing *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010)). The Seventh Circuit held in *Gayton* that "only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation." 593 F.3d at 624; *see also Stockton*, 44 F.4th at 615 ("Where a plaintiff offers sufficient evidence from which a reasonable jury could infer delayed treatment harmed an inmate, summary judgment on the issue of causation is rarely appropriate.") This principle does not apply to this case, however, because there is no dispute here about whether delay in Plaintiff's treatment harmed him; there is clear evidence that delay in Plaintiff's surgery caused prolonged pain and surgery complications. (*See* Dr. Kahrilas Report at 9.) Rather, the question for determining Wilks' liability is whether his actions could be said to have caused this delay in the first place. Even under *Gayton* and *Stockton*, summary judgment is appropriate where the plaintiff has failed to show that a defendant's (even deliberately indifferent) actions contributed to the delay in treatment. *See Stockton*, 44 F.4th at 616 ("[T]here is no evidence [defendants' deliberate indifference] contributed to Madden's death . . . . This is one of those 'rare instances' in which summary judgment based on causation is appropriate.")

That Wilks' deliberate indifference had no effect on Plaintiff's injuries distinguishes this case from the cases cited by Plaintiff. He cites three cases in particular: *Smego v. Mitchell*, 723 F.3d 752 (7th Cir. 2013); *Cruz v. Cunningham*, No. 3:18 CV 1321 MAB, 2022 WL 1555371 (S.D. Ill. May 16, 2022); and *Degrado v. Carter,* No. 13 CV 5978, 2021 WL 3737712 (N.D. Ill. Aug. 24, 2021). (*See* Pl.'s Resp. at 13–14.) *Smego* involved a claim where plaintiff was not receiving *any* medical care at all for significant dental pain. 723 F.3d at 754. He had not submitted healthcare requests (he did not think he could). *Id*. Thus, non-medical official's deliberate indifference to

plaintiff's request for treatment was a cause of plaintiff's injuries because it would have alerted the medical staff to Plaintiff's need. In *Cruz*, Plaintiff brought deliberate indifference claims against various medical and non-medical officials after his leg injury was mistreated by prison medical staff. *See* 2022 WL 1555371, at *11–12 (S.D. Ill. May 17, 2022). Relevant to Plaintiff's argument, the court denied summary judgment for five of the non-medical defendants. *See id*. at *13–17. First, the court denied summary judgment for the health care unit administrator (like Allen) where there was evidence that the official was did not adequately address plaintiff's formal grievances. That failure could well have caused harm because the formal grievance procedure would have allowed the official to change Plaintiff's care standard, not merely inquire about it. *See id*. at *13–14. The other four defendants were correctional officers who did not respond to Plaintiff's requests for medical treatment for a leg laceration and infection. *See id*. at *15. The key difference between these claims and Plaintiff's claim against Wilks is that at the time of the *Cruz* plaintiff's complaints to the correctional officers, he was not receiving any treatment for the laceration and, later, the infection. *See id*. There could be no contention, as there is here, that the defendant's actions did not causally delay plaintiff's necessary treatment. *See id*. at *15–16.

*Degrado* is factually akin to this case, but also distinguishable. Plaintiff there brought deliberate indifference claims against a non-medical officer after telling the officer (in a verbal communication, in a letter from plaintiff's mother, and through a formal grievance) that he was receiving inadequate care for a wrist injury. 2021 WL 3737712, at *4. Denying summary judgment in favor of the defendant, the court explicitly rejected defendant's contention that "if he or his designees had inquired regarding Degrado's care, they would have been assured that Degrado was being adequately treated based on his treatment notes." *See id*. at *6. The court reasoned that "[w]ithout offering evidence that such an investigation occurred, [defendant]'s hypotheticals regarding what might have happened are immaterial." *Id*. *Degrado* differs from this case in that the defendant there had received various communications, including a formal grievance, from the plaintiff informing the defendant that he was receiving inadequate care; Wilks only learned of

Plaintiff's complaint from one, informal conversation. More importantly, the evidence in the record here—that Plaintiff's complaints were known to the medical staff and the administrators and being processed via formal grievance procedures—is directly material in that it negates any causal relationship between Wilks' deliberate indifference and Plaintiff's injuries. There is substantial evidence here that medical staff at Dixon failed properly to treat Plaintiff and to respond to his grievances and complaints. Wilks' failure to relay to the medical staff complaints of which they were already aware cannot be said to have caused Plaintiff's injury.

E.     Defendant Hendrix

Plaintiff's claim against Hendrix fails for similar reasons. Hendrix, like Wilks, made rounds and heard complaints from inmates regarding medical care. It is undisputed that Hendrix was not responsible for "ensuring inmates got to a hospital if an inmate needed medical attention," or for "review[ing] inmate medical records," or for "[o]rdering medical treatment for individuals-in-custody." (*See* Pl.'s Resp. to DSOF ¶¶ 62–68.) Hendrix "made no decision regarding the health care provided to inmates." (DSOF ¶ 65.) As such, Hendrix's ability to respond to complaints regarding medical care was limited to "ma[king] a phone call and ma[king] sure [the inmate] was being seen and mov[ing] on from there, ma[king] sure that he was receiving medical care appropriately." (Hendrix Dep. Tr. at 103:18–104:5.) In light of the undisputed evidence that Plaintiff was regularly receiving medical care, and that the medical staff was aware of his complaints through sick call requests and formal grievance procedures, there is no basis for a jury to conclude that Hendrix's deliberate indifference to these informal complaints was a cause of Plaintiff's injury.

Unlike Wilks, Hendrix was involved in Plaintiff's formal grievance procedure. (Hendrix Dep. Tr. at 86:8–23.) Because the formal grievance was the most direct method to challenge Plaintiff's standard of care, deliberate indifference regarding the grievance could be seen as a cause for Plaintiff's injuries—but there is no evidence of such deliberate indifference on Hendrix' part. Upon reviewing Plaintiff's grievance, Hendrix immediately identified the situation as an

"emergency" and put Plaintiff's grievance on an expedited schedule. (*See id*. at 86:8–87:9.) Plaintiff has provided no evidence or law to suggest that Hendrix was required to do more.

## **CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment [249] is **granted** with respect to Defendants Jacob Long, Justin Wilks, and Troy Hendrix and **denied** with respect to Amber Allen. Plaintiff's motion [243] is denied.

ENTER:

Dated: December 9, 2024

_____
REBECCA R. PALLMEYER
United States District Judge